Good morning Your Honors, and please the Court. My name is Lee Smoller, and I represent the appellate plaintiffs in this matter. I would like to try to reserve four minutes for rebuttal, please. Plaintiffs' Appeal The District Court's decision granting defendants' motion to dismiss the second amended complaint is presented under standard of ditto overview. The facts alleged in the second amended complaint comply with all the elements of securities fraud under the preceding standards of the PSLRA and the federal rules. The two primary issues on appeal are the issues of falsity and ciander. This is a case where the sum is greater than the amount, and when you look at all the corroborating evidence, plaintiffs have plausibly alleged that the statements defendants made throughout the class period were false or misleading within the context in which they were made. There is no dispute, and all the evidence points to the fact that thrombosis rates started rising in 2011 or even higher in 2012, rising to all the way over 8 percent. In 2013, plaintiffs alleged 8 percent. Defendants sometimes say 5 percent, sometimes they say 6 percent. That's a factual issue. When all the corroborating evidence based on defendants' monitoring of the data, they admitted that back in 2008 they told the FDA that they were going to collect post-surveillance marking data on all thrombosis rates, and it was required that they report that data to the FDA. So, they were following the data. They admitted throughout the class period that they had a, quote, earlier look on the data that they were looking at thrombosis rates, and that review pointed that rates were maintained at then 2 to 3 percent of what they were during pre-clinical trial rates. Defendants even stated two days after the New England Journal of Medicine study was disclosed that they had performed a, quote, extensive analysis of the increase in rates and had, quote, closely monitored the rates. Plaintiffs also allege that not only were defendants collecting all this data, but that clinicians and the FDA became so concerned with the rising rates, in 2012 the FDA launched an investigation through Interact, the very entity that the defendants were following to determine the rise in rates. In early 2013, clinicians stated that they specifically reached out to defendants and told them there's this deadly rise in rates, we're really concerned, and they said that, quote, we're cooperating in getting all the data for that. So, the district, the lower court, didn't analyze all of that data. They picked out a few pieces of evidence. They picked out a piece of evidence of the MAUD data, which we also allege to establish rates. Now, the MAUD data is a database, it's not really alleging rates or events, rates, but did you have all the information for rates? I thought you had events and then sales figures, and you kind of have to piece them together, and you didn't have how many they were selling, did you? There are, yes, to answer your question, yes, the defendants disclosed on a few occasions how many units were implanted, so we do have a chart and a complaint also comparing that, but we, federal courts around the country, have allowed clinicians to extrapolate rates based on the SADs and the MAUD data. But again, this is just one minor piece of information, because the defendants all along were touting rates and talking about rates, and in the period before the SADs came out, it's your theory that because they were still talking about rates, there was like an omission, a misleading omission. I'm wondering whether that's the core of your theory, or whether your theory is that the statements were false in and of themselves, like if they just stayed silent in that period, would they have been okay? If you mean if they didn't talk about rates at all, yes, they would have been okay. But they put rates at issues, and the bargain, and the investors were fully focused on rates, which is evidenced by the analysts throughout the entire class period. Every time the defendants talked about rates, when the New England Journal of Medicine study came out, and then at the final disclosure in August, analysts came out and said, oops, we thought that rates weren't a big deal, but now that they are, we recommend that you go buy the one competitor product that's on the market, heartware. And that's another allegation that we have in the complaint that was floored by the district court, that while HeartMate's rates throughout its class rates continued to rise throughout the class period, their one competitor's rates were disclosing decreasing rates, and the analysts were continually comparing and contrasting throughout the class period. So, defendants knew that once they started disclosing that rates were increasing, they were going to lose their share of the bargain. And with respect to Cyanter, and now in this case, falsity and Cyanter overlap greatly, aside from collecting the data, monitoring the data, and many defendants, Burbach and Harris, admitted that the rates had risen in 2011, 2012, and 2013. Now, Harris says they went up to 6%. Burbach said our rates closely monitored Intermax, which one of the Intermax studies showed 5%, and one said they reported to correct, and it was 6.4%. Those are all issues of fact, but the point remains that the statements that they made, that rates remained deep at 2-3% were false and misleading in context, and that they knew, or what was the term, a blind eye, because they knew they had one of two scenarios. Either they collected all the data, had the data, knew their rates were not 2-3%, and told the market they were, or they followed the Intermax data, collected all the data, and didn't do anything about it. Now, we know that that's either scenario, we've established Cyanter, and the fact of the matter remains is that in early 2013, the clinicians specifically told the credit, rates are rising, they're deadly, clinicians are concerned, and can you please help us gather information? Now, aside from having evidence of outage, he has also alleged the for-operations theory, which is a by-law theory, and I assert that reasonable, first of all, and in other cases, can you view this complaint and the allegations holistically, along with the allegations that defendants knew of the increased rates, had access clearly to the rates data, and because HeartMate was the rat's leading product, and the market... How long do you claim they knew that they had been with clinicians? Since the beginning of the class period, 2011. Until when? They had already been specifically told, aside from collecting data, that rates had risen to a deadly rising rate, morbidity and mortality had increased. And then after that time period, on that time period, until the end of the class period, they continued to hide them all from investors at the market. In fact, they came out and said, after that period, Burbach, that rates are low, we're monitoring intervents, which is true, they were monitoring intervents, but they were downplaying, and in fact, they went so far as to say that sales would not be impacted by concerns over thrombosis rates, this is after the New England Journal of Medicine suddenly was disclosed, and then just a few months later, in August, sure enough, they disclosed that sales were severely impacted by the New England Journal of Medicine study, and the fact that clinicians were very concerned over rising rates, and the stock dropped 25% in one day. And on that disclosure, analysts came out and said, oh, we misunderstood what the company said back in November, and now we were downgrading, and we suggest you go by our order, because clearly the problems with thrombosis rates here are not going away. The district court divided the time periods into segments. If we think that there were enough allegations of misrepresentations on one of the time segments, but not the other, like, say, before the studies, but not after the studies, what should we do? Do you accept the division of the time periods? I understood what you're saying, and I accept that there are two time periods in this class. In the class period, one before the disclosure of the New England Journal of Medicine study, which is a partial disclosure, and then the final August disclosure, I submit that the false studies went on for the whole class period. But if the court were to cut it off, the plaintiffs still have a final cause of action, and then you would just have a smaller class period, is that what we're talking about? Correct. Correct. Do you want to say the rest of your time? Yes, please. Thank you. Thank you. Good morning, others. May it please the Court, Patrick Gibbs from Cooley for the defendants' appellees. In talking about these issues, I think it's useful to begin with just what it is we're talking about when we talk about a securities fraud. The gist of a securities fraud claim is supposed to be that the defendants made statements about the company or its business. At the time they spoke, they had information that was inconsistent with or undermined in some meaningful way the statements they made. And the stock dropped when the market learned what the defendants had known all along. That is, in a nutshell, what a securities fraud case is supposed to look like. The problem with this case is plaintiffs do not actually allege what information the defendants had on any of the specific dates where the challenge statements were made. They do not allege specific facts showing that the information known to the defendants when they spoke was inconsistent with what they said. And they do not allege facts showing that when the market heard about the New England Journal of Medicine's article, that the market was learning something the defendants had known all along. And so for that reason, the complaint fails both for purposes of falsity and scienter, and it also fails for purposes of loss of information. I think conceptually the challenge statements fall into three buckets. There are the two time periods that the Court has alluded to, and then in the latter time period there are two categories of statements, roughly speaking. Some statements talking about thrombosis rates, principally talking about the differences between the New England Journal of Medicine article and the Aramidic Society. And then there's, I think, a separate category of statements that are statements of the financial guidance, the forward-looking financial guidance or reaffirmations of the guidance, which I think are analytically distinct. But most of the allegations in the complaint, most of what you heard here today, I think were related to the statements before November 27, 2013. So I'll focus mine so I'm there as well unless the Court has questions about that. One of the things that's very important for the Court to keep in mind here is, on appeal, the plaintiffs are challenging seven statements that relate to thrombosis rates before November 27, 2013, seven statements. And when we clean that from their opening brief at pages 18 to 19, note 2, that's where they identify which of the statements they're still challenging, and they list some statements they are no longer challenging for purposes of appeal. All seven of these statements took place over a nine-month period of time, beginning on May 11, 2011 and ending on February 16, 2012. Now, you see repeatedly in the briefs and you heard repeatedly here today lots of references to things that clinicians were saying to Thoratec in 2013. That's totally irrelevant. It's over a year after the last of the challenge statements that relates directly to thrombosis rates. What matters for purposes of falsity and scienter is what do the defendants know about thrombosis rates between May 11, 2011 and February 16, 2012. I mean, it was spoken earlier in September and April. February 16, 2012 is the last of the challenge statements that speaks to thrombosis rates. Now, please do not list any facts showing that anyone, whether inside or outside of Thoratec, had even observed an increase in thrombosis rates during that period between May of 2011 and February of 2012. Again, you hear repeated references to concerns expressed in 2013, but no information suggested that anyone anywhere had actually observed an increase in thrombosis rates during the period in which the challenge statements were made. Plaintiff's primary source for saying repeatedly, it's undisputed, that the rates were raising is the American Journal of Medicine article that was published on November 27, as well as a study published by Intermax that same day. Intermax had also published a preliminary data on September 6 of 2013. What plaintiffs have not listed, though, are any facts showing that the data reflected in the New England Journal article or in the Intermax study was reflecting data that was known to any of the defendants when they made the challenge statements between May of 11 and February of 12. Both of these studies evaluated data up through early 2013, or at least the end of 2012. So, in other words, by the very nature of these two studies included data, it's not just a fatal defense that had not yet eased to occur when the challenge statements were made. We know, for example, that the Intermax study wasn't even underway until the spring of 2013. It's not clear from the beginning when the work began on the New England Journal of Medicine article, but we know it began sometime long after the last of the challenge statements, and I think that's a reasonable inference given the data they used in the study. Plaintiff's complaint includes a number of other very vague and very conclusory allegations about information that was supposedly available to defendants during the class period, but they don't come close to identifying any specific contrary information available to the defendants when they spoke. Plaintiff repeated his language in various forms throughout the briefing, and again here today, I think one of the best examples is at page 44 of their opening brief, and there's some bullet points that lay out what I assume are some of their favorite allegations, and they characterize them in a way that I think is, that I presumably think is most favorable to do. But I think they're not supposed to go for what they don't say. For example, and I'm just running through that list on page 44 of their brief in order, Plaintiff's complaint, there were physicians on-site at Thoratec examining clinical data. That's what they said. They don't say anything about what that clinical data showed, when it showed it, or even that the clinical data that's being referenced in this allegation has anything to do with thrombosis. There are a number of other types of adverse events that are closely studied. This allegation says nothing about clinical data, about thrombosis, much less data showing an increase during the period when the defendants were speaking about it. This allegation doesn't even talk about heartbeat, too. Plaintiff's claim that the company performed post-approval studies. They don't say anything about when those studies were prepared, when they were completed, what they showed, or when they showed it. There's no basis for any inference that the post-approval studies put the company on notice of an increase in thrombosis rates. Plaintiff's argument that the defendants knew about reports of serious adverse events or SAEs related to heartbeat, too. The complaint, in paragraphs like 78 through 85, takes at least events and fails data and extrapolates to try to go all the way back to 2010 and 11, which would be in the time period you're talking about. I think part of their argument is that the company knew about the events and wouldn't have been documenting these rates themselves. It's implausible to say that they didn't know that there was an increase. So what's your response to that? There are several responses to that. I agree, and that's what the complaint alleges. In fact, the plaintiffs criticized the district court for focusing on the allegations about the mod data. That is actually what the plaintiffs cite as evidence or allegations that the statements were false. The mod data and the sales data doesn't get you there for the following reason. When the defendants were speaking about thrombosis rates, they were talking about clinical studies that express thrombosis rates in terms of events per patient year. This is a factor that takes into account not just how many devices and how many events of thrombosis, but how long the devices were in place. So for purposes of that measure, if I have one of these devices implanted and I experience a thrombosis in the first month, that's very different from getting the device implanted and having a thrombosis after two or three years of extended or hopefully improved life. So the thrombosis rates that were discussed during the class period are thrombosis rates expressed in terms of events per patient year. The New England Journal of Medicine article and the Internex, which the plaintiffs claim together revealed at least some of the truth about increased rates, also expressed the increased rates in terms of thrombosis events per patient year. Plaintiffs' allegations about the mod data and the sales data does not measure events per patient year. It can't measure events per patient year. And so one of the things that just to correctly conclude is because this isn't even measuring the same thing, it doesn't write their statements about events per patient year false or misleading. But does that just encourage, if we agree with that, does that just encourage the company not to do studies? I mean, if you have, and they're alleging that there was information about increased events and increased events, and so you say, okay, we're just going to close our eyes and not do the relevant calculations so we don't have one that contradicts. Is that what you're asking us to do? Rule is okay. I'm not asking a rule that's okay. I don't think it's okay, and I frankly don't think that this court needs to allow a claim of securities fraud to go forward. Regarding that possibility, there is a ton of regulation about monitoring data and performing post-approval studies and monitoring device performance that is regulated heavily by the FDA. We don't need to put these defendants at risk of a frivolous securities fraud claim in order to encourage companies to perform studies. And the truth is, there are studies going on all the time for devices like this. This device was a major advance in the treatment of people who are suffering from advanced heart failure. So people who are likely to die very soon and extended their lives or improve the quality of their lives, it's being studied constantly. Almost all of it is from the data, but it's long. Did you have a study that is in the in-between period of the 2011 and 2012 period where you could say, look, we were doing these studies, and it showed that on the relevant measure everything was the same, and that's why we weren't truthful? Or do we have this big gap? I don't think we have a gap. But the record is limited because the plaintiffs get to choose once in their complaint. But I would refer the court to our supplemental experts for the record, beginning at page 34. What this is, in a complaint, the plaintiffs say that in August of 2014, about the same time they announced the earnings miss, that plaintiffs say finally revealed the full truth. The FDA also. Sorry. I'm sorry. Did you just say the ER page again? Because I got to a signature page. Sorry. It should be in SER 34. Yeah. What this is, is the FDA, in the wake of all this information coming out about increases in thrombosis rates, the FDA directed Thorintec to change the labeling for the device. The labeling is supposed to include information about risks to the device, that sort of thing, and it is very closely scrutinized by the FDA. It's heavily regulated. So this document is the revised label mandated by the FDA to try clinicians and patients about the risks associated with this device. If you look at this FDA-approved revised label, there are discussions of a wide range of clinical trials, both pre- and post-approval. I believe some of those trials do encompass the time period in question. There are trials that are going to continuously, and they're cited, some of them, at SER 50. Some of them are cited at SER 51. Excuse me. Can you point us to what part of this FDA label is supposed to show that you're right about this? Yes, I'd be happy to. So at SER 50, for example, there is a chart looking at various clinical trials to measure pump thrombosis. The one that includes the most recent data is the third of the three that are listed there in the middle of the page, which says worldwide clinical experience, but not three. And this covers data from 2005 to 2013. It's 11,647 implants. You see there the percentage of confirmed thrombosis rates, like 2.9. This is the FDA telling Florida Tech what they need to tell people about thrombosis. But it also says suspected or confirmed 6.4. I understand. But when the defendants were speaking about rates of 2 to 3 percent, they're talking about confirmed or not suspected. I mean, so that gets to the omission point. I mean, it's not clear from the statements that that's what they're talking about. I think it's clear from the statements they're talking about because when they're making these statements, they are referencing specific studies that are public. Some public information. This is information that Florida Tech itself controls. There are other entities out there studying these things and continually publishing reports, and that's why I wanted to show the court these pages because they reference some of those. We also ask for judicial notice of a number of slides that go along with the transcripts of the defendants making some of the statements that are shown. And those slides also reference the number of studies, and these are the studies that are going on continuously. So Florida Tech has this data that's being collected on an ongoing basis, right? Florida Tech has the data, but we need to be careful about what this data means. The data eventually ends up being able to give you a percentage of confirmed or suspected. And my question is, where a company has that data, is there no way or inclination to be assessing it on an ongoing basis as opposed to waiting until the end of the years for a total composite look-back that would give you statistical significance or whatever? Real-time versus? Yeah, so the plaintiff's legislative facts that suggest that you can even do this in real-time. The plaintiff's claim that this information was really important to everybody. It was important to the FDA. It was important to Intermax. It was important to the securities analysts. It was important to the company. It was important to clinicians. But there's a reason why Intermax wasn't able to publish even preliminary data going up through 2012 until September of 2013, and there's a reason why the New England Journal of Medicine, looking at data up through early 2013, wasn't able to publish any numbers until the end of November of 2013. If you look at the evidence. That's the reason. I mean, it's peer review or something. Maybe you wouldn't have that injury. Also, if you look at the studies, they are into the submodelizers of the record. The Intermax study and the New England Journal article, I think, both talk about the extensive work they have to go through in order to confirm diagnoses of thrombosis. They talk about the fact that this is a difficult thing to diagnose accurately and consistently across different centers. The New England Journal article actually notes the fact that during the period covered by their study, the definition of thrombosis was changed, and the Intermax study actually used the newer definition that wasn't available to the New England Journal. So this isn't something like the weather, and you can just say I'm tracking the daily temperature. This is an extraordinarily complex medical diagnosis that has to be made for each instance, and then the studies also show extensive statistical analysis to arrive at the numbers that the plaintiffs are acting like you can do in real time. The final point I want to make about this is the numbers the plaintiffs have used, the sales increases and increases in the number of events in the mock data. That data was public throughout the class period, and yet the only people ever in the history of this device to use that data to try to draw conclusions about thrombosis rates are the plaintiff's lawyers sitting in this courtroom. No one ever, as far as we know from the pleadings and the documents, has ever believed that you could draw reasonable and meaningful conclusions about thrombosis rates by comparing sales growth to the growth of events in the mock database, and that's because that information is not complete enough to draw that conclusion. It's like saying I can tell you that Buster Posey's batting average went down because he had fewer hits this year than he did last year. No, you can't. That doesn't give you enough information to say the plaintiff's saying this is a methodological dispute. It's not a methodological dispute. There may be different methods of calculating thrombosis rates. I'm sure there are. I can't figure out, but I'm sure there are. This is the question about how you calculate thrombosis rates. They don't calculate a thrombosis rate. They can't because it's expressed in terms of events per patient. So they're using the proxy they have to try to say that studies that weren't available to them in between must have been showing this, right? And you're saying it's impossible to do those good studies, but so that's why they're using this other thing. Isn't that the response to the argument you're making? Well, maybe the response to that doesn't mean it adds into security's product. I mean, the fact that the only data they were able to cobble together is the only data they can cobble together doesn't mean it actually shows anything. It's true or false. So I understand, yes, they claim they don't have any of the data available. The truth is, the other thing that I think is important to keep in mind is these studies are published. They're published. These institutions are accustomed to saying they publish these things. They are out there. I can't come in here and show them to you because the procedures will come from Oregon, but they're out there, and that's why we try to point to the slides where the speakers are talking about studies that are happening on an ongoing basis, and I'm pointing you to the FDA's mandated label, which talks about studies happening all the time. There are studies out there. Believe me, if there were a city... So what's the harm of letting you go and to pass this procedural stage and show those studies in case of re-judgment? That's an extraordinarily expensive proposition for the company, for its former directors and officers, for its DNO insurers, and the PSRA was put in place precisely to make sure that people were not exposed to that ransom of dive spends unless the complaint adequately pled a claim for securities fraud. And an absence of information is not a basis for accusing these people of lying to their shareholders. So it isn't manufactured, this absence of information. If it's a procedural matter, I can show it to you. I think the record does reflect that there are studies going on continuously, and believe me, if there was a study that existed in 2011 or 12 that showed an increase in thrombosis rates, you'd be hearing about it. You're not. And I will submit the absence of information here is not suggestive of securities fraud. It's suggestive of your sex in the office. Thank you. Thank you. Well, my opponent and I agree on one thing, and that is the issue here is securities fraud. It's not about a group of scientists sitting in a room analyzing data. And my opponent is saying that, oh, they didn't know the data early on and there's no way to analyze the data until the end. But they were telling the market, we analyzed the data, and the data shows a continued low thrombosis rate of 2% to 3%. I can take your honors through the exact statements of defendants Burbach and Harris throughout the last period. So in the absence of what Your Honor Shreeland had asked me before, and the absence of defendants saying, would there be a case here? No. But they were. They told the market, we're continually monitoring this data. The data is showing us 2% to 3% thrombosis rate when, in fact, either they had the data and it showed, as Burbach and Harris admitted, that the rates had increased in 2011, 12, 13, or they didn't have the data and then they were extremely frivolous in telling the market that they had it because the investors here rely on the price and they rely on the analyst to The last statement, which I don't believe was false, was in February 12th. No, that's a mistake. That would be the first part of the last period. But we also alleged a plethora of false statements after the New England Journal of Medicine came out in November of 2013 through the final disclosure in August of 2014. And in that time period, there are 1, 2, 3, 4, 5, 6, 7, 8, 9 false statements in that class period, in that part of the class period. There's a lot of those. Absolutely. And what matters here is, have plaintiffs plausibly established a claim for securities fraud? Have they plausibly established falsity? Have they cogent, compellingly established a handjerk? And the answer, overwhelmingly, is yes. When the courts are required to look at the evidence and the allegations holistically, it's not a one piece of evidence. It's not just that, well, nobody uses MAUD data. And the reason that plaintiffs included the MAUD data in the second amended complaint is because the district court in the first amended complaint stated specifically, I don't think you've established rights. And one way to establish rights is to take the MAUD data and compare it to the sales data or the unit volume data, and then you can establish rights. So plaintiffs did exactly that. But again, it's simply one small piece of the evidence. And you have, with counsel claiming that defendants didn't know of increased rates or they're not admitting that there were increased rates and that there's no data that there's increased rates, the NRMAC study shows it. The New England Journal of Medicine study shows it. Burbach and Harris. Burbach made a statement December 4th, 2013, that still was in the class period, saying, if you look at that, there's a slight increase beginning in 2010, gradient from 2011 and 12. And then in 2012, it's going to be decreasing rate, which we know at that time was a false statement because it increased all the way up to over 8% in 2013. And even by the NRMAC data, NRMAC specifically stated that according to defendants in January of 2013, that was over 6%. You have Harris in December 2013 stating, NRMAC has shown that the rate has increased from low to single digits a few years ago, gradually, in the 2011-12 time frame, to 6%. Does Harris, is CFO admitting that? Then you have Burbach stating again in January 2014, our internal data is very consistent with NRMAC, showing a small increase over time, which the last part is a lie because we know the increase was fourfold. And we know this because my opponent keeps referring to all these studies that were available on the market. It's simply not the case, and we know this because analysts were reporting constantly throughout the class period. And when the truth finally came out in August, and the stock dropped 25%, the analysts specifically said, uh-oh, the problem with thrombosis rates is a lot worse than we thought. Well, why is it worse than they thought? Because they were relying on the company to tell them what the rates were. And they went so far as to say, we recommend that you buy hardware now. Hardware will soon. Thank you very much.
judges: Kozinski, Friedland, Arterton